Alexandria

LEON PAT FERGUSON

v.

COMMONWEALTH OF VIRGINIA

No. 0736-87-4

Decided April 10, 1990

COUNSEL

R. Ramsey Maupin, for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

DUFF, J.—Leon Pat Ferguson appeals his convictions of (1) three counts of robbery; (2) two counts of abduction; (3) seven counts of use of a firearm in the commission of a felony; (4) one count of entering a bank while armed with the intent to commit larceny; and (5) one count of capital murder committed while armed with a deadly weapon. The jury fixed his punishment at life imprisonment on the capital murder charge and various terms in the penitentiary on each of the other convictions. After receipt of a presentence report, Ferguson was sentenced in accordance with the verdicts. This appeal is from that judgment.

The sole issue presented on brief and in argument is whether the trial court committed reversible error in admitting the testimony of one Adrian Johns that Ernest Russell, an alleged accomplice, told her that "they had to kill somebody because the man was in their way." At the outset, however, we are faced with a motion to dismiss the appeal because transcripts of the proceedings of March 18, March 19, and May 8, 1987, were not timely filed and, thus, are not part of the record. Finding that we are unable to review the entire record and that such a review is necessary to address adequately all issues raised by the merits, we grant the motion to dismiss. A brief review of the facts and the procedural background relating to the transcripts will serve to illustrate the basis of our holding.

On November 22, 1985, the Shirlington branch of the First Virginia Bank was robbed by two black males. Shirley Rose, one of three bank tellers working that day, saw one of these individuals walk past the front of the bank three times. Becoming suspicious, she activated the bank's cameras when she saw the two men enter. She testified that the shorter man, later identified as Ernest Russell, Jr., walked toward her and the other tellers, ordered them to move away from their counters and lie face down on the floor. Russell then took money and coins from the teller stations, at one point demanding, "Where is the money, bitch, or else we are going to kill somebody?"

Shirley Rose, a customer named Leo Fayette, and a passerby, Ed Walker, all identified the other man as Leon Pat Ferguson. He approached the assistant manager, Orzillo Pulliam and a customer, General Maurice Saylor, who were seated at Pulliam's desk. Ferguson put a gun to Pulliam's head, dragged both Saylor and Pulliam across the floor and handcuffed them to a nearby file cabinet. Pulliam described the gun as a chrome pistol; Saylor described it as a gray-bluish metal revolver having a dull chrome color.

Ferguson proceeded to the entrance of the bank to keep a lookout. About that time Leo Fayette, a former police officer and firefighter, entered the bank and was confronted by appellant, with a gun, who pushed him over against the wall near the entrance. Ferguson had something sheer, like black nylon, over his face. When he grabbed Fayette's arm, Fayette looked directly into his face for two or three seconds.[1] Moments later a woman walked into the bank and received the same treatment.

When Robert Jennings, an elderly man, entered the bank and saw that a robbery was in progress, he attempted to dissuade Ferguson, saying, "Why are you guys doing this? You don't have to be doing this. I have done nothing to you. Leave me alone." A struggle then ensued between Jennings and Ferguson, the latter shooting Jennings once in the neck and once in the body. Both were fatal wounds.

Outside the bank Ed Walker was looking through a window and concluded that a robbery was in progress. He returned to his truck

---

[1] Thirteen months later Fayette picked Ferguson out in a lineup.

which was parked nearby. He saw Ferguson, carrying a gun, and a shorter man, carrying a white bag in his hand, leave the bank and walk to a Lincoln Continental Mark IV automobile which was parked some distance away. Walker then fled the scene and called the police.

Adrian Johns was called as a Commonwealth's witness. She and Ernest Russell lived at 433 Quincy Street in Arlington, Virginia. Russell had previously told her that "he robbed banks for his hustle." The morning of the robbery Russell had left for work wearing a "Guest" jacket she had lent him. Russell returned home around noon, and Adrian heard him putting money and change in a jar. Over objection Johns was permitted to testify that Russell had told her "they had to kill somebody because the man was in their way." Johns further testified that she noticed that Russell's car, a Lincoln Continental, was not in the front of the house but was parked in the rear.

The record further contains evidence that Rhonda Carroll, Russell's cousin, also lived at 433 Quincy Street, and was at home when Russell returned the day of the robbery. Russell was not alone; Leon Ferguson was with him and was wearing a sports jacket.

Russell later asked Adrian Johns not to wear the jacket she had lent him the day of the robbery because their next door neighbor was a retired police officer. Approximately one week after the robbery Russell also told Adrian to "get rid" of the Mark IV car, which she did.

A search warrant was executed on Russell's home on March 31, 1986. A revolver and bullets were seized from his bedroom. At trial, Leo Fayette identified the gun as the same type pointed at him during the robbery. Also seized were two pairs of light colored surgical rubber gloves and a portion of a lady's stocking, identified by Fayette as similar to the one he saw on Ferguson's face during the robbery. Expert testimony showed there were no inconsistencies between the bullets taken from Jennings' body and those test fired from the gun seized in the search of Russell's bedroom.

A fingerprint taken from the handcuffs Ferguson had used to confine Mr. Pulliam and General Saylor during the robbery was

identified by two fingerprint experts as having come from Ferguson's left ring finger.

Finally, in July 1986, in a conversation with Detective Stephen Carter, Ferguson asked him, "Why did it take you eight months to find me?"

The case was tried before a jury on March 16, 17, 18, and 19, 1987, with verdicts of guilty being returned on the latter date. A pre-sentence report was ordered and on May 8, 1987, the court imposed the sentences recommended by the jury. The written order exemplifying the sentencing proceedings of May 8, prepared by the clerk, was entered by the trial court on June 2, 1987. That order contained, inter alia, the following provision:

. . . and it is further ordered that upon the timely filing of the transcript of the trial herein, the same shall become a part of the record pursuant to Rule 5:9(a) of the Rules of the Supreme Court of Virginia. . . .

On June 11, 1987, Ferguson filed a "Notice of Appeal" in the circuit court and certified that a copy had been mailed that date to opposing counsel and to the Clerk of the Court of Appeals in Richmond. The Notice of Appeal, pursuant to Rule 5A:6(b), contained the following statement by Ferguson:

A transcript of the hearing held on December 3, 1986, February 4, 1987, and March 16, 17, 18, and 19, 1987 and other incidents of the trial shall be filed and made a part of the record.

Rule 5A:8, provides that "the transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court within 60 days after entry of a judgment. The judge of the trial court may extend this time for good cause shown." The trial transcripts for March 18, March 19, and May 8, 1987, were filed with the clerk of the trial court on August 4, 1987, more than sixty days after entry of the final order on June 2, 1987. No extension of time was applied for or granted. The transcripts of March 16 and March 17 were timely filed.

On August 15, 1988, appellant's counsel wrote to the Clerk of this Court asking that the letter be accepted "as Appellant's written statement as the Appendix pursuant to Rule 5A:25." As to witness testimony, only that of Adrian Johns (transcript pages 416 through 443) and Rhonda Carroll (transcript pages 448 through 454) was designated. The Attorney General responded by filing the Commonwealth's "Designation of the Contents of the Appendix" on August 18, 1988. After listing the testimony of Detective Carter, Julian J. Mason, W. F. Cloyed and Deborah Davis by asterisks, the designation concluded, "By designating the asterisked portions of the March 18, 1987 transcript, the Commonwealth does not concede that this transcript was timely filed. See Motion to Dismiss, filed this day." The March 18, 1987 volume of the transcript contained the testimony of Detective Carter, who executed the search warrant, the testimony of all of the Commonwealth's forensic experts, and the testimony in chief of all defense witnesses.

Assuming, but not deciding, that the statement attributed to Adrian Johns was inadmissible hearsay, the Attorney General contends that its admission was harmless error. A harmless error analysis, as mandated by *United States v. Hastings*, 461 U.S. 499, 510 (1983), requires us to review the entire record, which is not before us. We must decide, therefore, whether, under the circumstances of this case, the appellant was required to furnish a complete record, of the proceedings. The Commonwealth contends it was the appellant's responsibility and that the trial testimony of Detective Carter, Julian J. Mason, Willard Cloyed and Deborah Davis, all contained in the transcript of March 18, 1987, is necessary to make a meaningful harmless error analysis. Ferguson argues that the only error he assigned was the hearsay testimony of Adrian Johns, which is contained in the timely-filed transcript of March 17, 1987. Thus, his argument continues, the responsibility for seeing that other portions of the transcript were timely filed rested with the Commonwealth.

It is basic that an appellant has the primary responsibility of ensuring that a complete record is furnished to an appellate court so that the errors assigned may be decided properly. We agree, however, with Ferguson's argument that a defendant should not be required to anticipate the Commonwealth's defense to his claim of error and provide the record necessary to support the

Commonwealth's claim. Rather, the Commonwealth also has an obligation to ensure that the record contains the evidence supporting its contention, i.e., that the alleged error was harmless.

However, in his Notice of Appeal filed nine days after entry of the conviction order, Ferguson stated that the transcripts "shall be filed and made a part of the record." The conviction order, making the transcript a part of the record, was conditioned by its express terms upon "the timely filing" of the transcript. We hold that the Commonwealth had a right to rely upon Ferguson's statement that the transcript would be made a part of the record. It was not, and we are thus unable to make the requisite harmless error analysis. Under such circumstances, we do not address the merits of the error assigned and grant the Commonwealth's motion to dismiss.

*Dismissed.*

Koontz, C.J., concurred.

Benton, J., dissenting.

I agree with the majority that an appellant is not required to anticipate the Commonwealth's defense to the appellant's claim of error and, thus, is not required to provide the record necessary to support the Commonwealth's claim. I also agree with the majority that the Commonwealth has an obligation to ensure that the record contains the evidence necessary to support its claim of harmless error. I disagree with the majority that dismissal of the appeal is the appropriate remedy in this case. The Commonwealth asserts that it reasonably relied to its detriment on Leon Pat Ferguson's representation that evidence unrelated to Ferguson's claim of error, but necessary to the Commonwealth's defense, would be made a part of the record. Assuming, as does the majority, that the Commonwealth's reliance has been reasonable and that we are faced with a fairness issue, I believe that the appropriate remedy would be to permit the record on appeal to be supplemented with that evidence which was considered by the trial judge in rendering the judgment. The Commonwealth's reliance does not justify punishing this appellant, whose claim of error is supported by the record, and requiring him to exercise the writ of habeas corpus in order to obtain evidence to support the Commonwealth's claim of harmless error.

The record before us establishes that over objection, the trial judge permitted Adrian Johns to testify that Ernest Russell, one of the two men who robbed the bank employees, told her that "they had to kill somebody because the man was in their way." The judge's ruling was erroneous. The testimony of a witness concerning an extrajudicial statement of another, offered as evidence of the truth of the statement, is hearsay. *Arnold v. Commonwealth*, 4 Va. App. 275, 279-80, 356 S.E.2d 847, 850 (1987). Although the trial judge admitted the evidence as a third party declaration against penal interest, the judge erred because this recognized exception to the hearsay rule requires the party offering the evidence to establish the unavailability of the third party. *Scaggs v. Commonwealth*, 5 Va. App. 1, 5, 359 S.E.2d 830, 832 (1987). The Commonwealth offered no proof that Russell was unavailable.

The erroneous evidentiary ruling was not harmless. The proof linking Ferguson to the bank robbery consisted of doubtful eyewitness testimony and other circumstantial evidence. Russell was unequivocally identified as a participant in the robbery. The inference that the Commonwealth sought to have the jury draw from Russell's hearsay statement was a vital link in proving Ferguson's participation. The Commonwealth sought to tie Ferguson to the robbery first by attempting to show that Ferguson was in Russell's apartment counting money within an hour and a half of the robbery, and second, by allowing the jury to infer that Russell's incriminating statement also incriminated the person in the apartment with him.

Through the testimony of Rhonda Carroll, a convicted felon, the Commonwealth sought to establish Ferguson's presence in Russell's apartment. Carroll had been charged with robbing a bank with Russell on another occasion and had been given immunity from that prosecution in return for her testimony against Ferguson. For less than a second she was in the presence of a man whom she identified as Ferguson. Although she said that the man she saw for "a second" wore a "sports jacket," she did not describe whether the jacket was white or colored, whether it zippered or buttoned, whether it was short or long, or whether it was solid or patterned. Although witnesses testified that the robber wore "a sports jacket" and Carroll testified that the man she saw wore "a sports jacket," no testimony or evidence in this record

supports a conclusion that the jackets were identical or even similar. There is no evidence as to the style, color, length, or any other identifying characteristic of either "sports jacket."

Johns, a convicted felon, testified that a detective paid her one thousand dollars cash in exchange for her testimony against Ferguson. On direct examination, over objection, she testified as follows concerning a conversation that she had with Russell:

Q Explain to the jury what happened when you went to Rhonda's room that day.

A Well, he came into the room and he said *he* had to kill somebody.

Q Did he say in what connection, with what *he* had to kill somebody?

A No, he didn't.

* * * *

Q He told you *he* had killed someone.

A Unh-huh.
(emphasis added)

Despite responding on three occasions that Russell said that he, Russell, had to kill someone, on cross-examination she changed her testimony and then indicated uncertainty:

Q Now, when you met with the police, you told them that Ernest [Russell] had said that he had to kill somebody or they had to kill somebody because the man was in his way or something like that.

A They had to kill somebody because the man was in their way, yes.

Q He and they, which one did he use?

A I don't know.

She then testified that she had given a statement to the police to the effect that Russell said "[h]e had to kill somebody or they had to kill somebody because the man was in his way, something like that."

It is beyond dispute that Russell was present and implicated in the killing. The evidence, exclusive of Russell's statement, proved that Russell was one of the two persons who robbed the bank. However, Russell was not a defendant in this trial. The Commonwealth obviously deemed the hearsay statement purportedly made by Russell to be significant as a link in the chain of proof placing Ferguson in the bank. By attempting to prove that Russell's statement was made under circumstances that related to the robbery and his companion, the Commonwealth wanted the jury to infer that Russell's statement also implicated his companion at the time — who the Commonwealth alleged was Ferguson.

That evidence was crucial to the Commonwealth's case because, despite the majority's assertion that Ferguson had been identified by eyewitnesses, the circumstances of these identifications were less than ideal. The witnesses were only able to see the face of the second robber for one or two seconds. Moreover, the robber that each identified as Ferguson wore a black nylon stocking over his face and head. More than sixteen months passed between the robbery and the trial in which Ferguson was identified by the witnesses. Despite the witnesses' testimony that they were able to look directly at the robber's face for only two or three seconds and despite the fact that the robber wore a black stocking over his face and head, the Commonwealth sought to have the jury believe the witness identifications. The corroboration provided by Russell's hearsay statement was an important part of that effort.

In its harmless error analysis, the Commonwealth downplays the significant impact of the hearsay statement and places unwarranted emphasis on inconclusive circumstances. In support of its conclusion that the evidence against Ferguson was overwhelming, the Commonwealth relies upon a statement made by Ferguson to a detective following their conversation in New York. The detective testified that as he was leaving Ferguson after an interview, Ferguson said "Why did it take you eight months to find me?" There is nothing intrinsic in either the statement or the circumstances surrounding the statement that suggests that Ferguson was guilty. The Commonwealth asserts that the statement is incriminating; however, the Commonwealth provides no clue as to the significance that it attaches to the statement. The Commonwealth relies on innuendo by taking out of context one statement that was made following a lengthy interview in which the police

confronted Ferguson about the robbery.

Likewise, while it may be suspicious that one of Ferguson's fingerprints was found on a handcuff used in the robbery, that fact alone is not sufficient to prove guilt but is a circumstance that the jury could have considered. The jury was also aware that the robbers were wearing gloves when the handcuffs were used. Because the evidence established that Ferguson and the identified robber were friends, there are numerous circumstances that may account for Ferguson's print on the handcuff.

Both of these matters — the statement and the print — are matters for the jury to consider. Their existence does not support a conclusion that the evidence of Ferguson's guilt was overwhelming. By cataloging a set of circumstances that it deems suspicious and lumping those circumstances with the abundant evidence of Russell's guilt, the Commonwealth mistakenly concludes that the evidence against Ferguson is overwhelming. The evidence in this record does not support a conclusion that the Commonwealth "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Jones v. Commonwealth*, 218 Va. 732, 737, 240 S.E.2d 526, 529 (1978). The inadmissible hearsay evidence served the purpose for which it was offered by the Commonwealth — to prove by inference that Ferguson was the robber. Accordingly, I would reverse the conviction and remand the case for a new trial.